Jessica Ruth Lobis Buckwalter, Esq. (State Bar No. 199200)
LEWIS BAACH KAUMFANN MIDDLEMISS PLLC
1050 K Street, NW, Suite 400
Washington, DC 20001
(202) 659-7971
jessica.buckwalter@LBKMlaw.com

*Attorneys for Plaintiff EQIBank Limited*

FILED
Jun 29, 2026
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

REDACTED

~~SEALED~~

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

EQIBank Limited,

*Plaintiff,*

v.

United States of America,

*Defendant.*

No. 2:26-mc-0208 DAD CKD

**NOTICE OF MOTION AND MOTION FOR RETURN OF PROPERTY PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 41(g)**

**DEMAND FOR HEARING**

TO THE UNITED STATES ATTORNEY'S OFFICE FOR THE EASTERN DISTRICT OF CALIFORNIA AND ALL OTHER COUNSEL OF RECORD:

PLEASE TAKE NOTICE that, at a date, time, and location to be determined, Petitioners will move this court for return of property wrongfully seized by the United States Government pursuant to Fed. R. Crim. P. 41(g).

This motion is based upon this notice and the accompanying memorandum of points and authorities and the evidence and records on file with the Court.

Dated: June 24, 2026

/s/ Jessica Ruth Lobis Buckwalter
Jessica Ruth Lobis Buckwalter, Esq.
LEWIS BAACH KAUMFANN
MIDDLEMISS PLLC
1050 K Street, NW, Suite 400

Washington, DC 20001
(202) 659-7971
jessica.buckwalter@LBKMlaw.com

*Attorneys for Plaintiff EQIBank Limited*

Jessica Ruth Lobis Buckwalter, Esq. (State Bar No. 199200)
LEWIS BAACH KAUMFANN MIDDLEMISS PLLC
1050 K Street, NW, Suite 400
Washington, DC 20001
(202) 659-7971
jessica.buckwalter@LBKMlaw.com

*Attorneys for Plaintiff EQIBank Limited*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EQIBank Limited,<br>*Plaintiff,*<br>v.<br>United States of America,<br>*Defendant.* | No.<br>**MEMORANDUM IN SUPPORT OF MOTION FOR RETURN OF PROPERTY PURSUANT TO RULE OF CRIMINAL PROCEDURE 41(g)**<br>**DEMAND FOR HEARING** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii
PRELIMINARY STATEMENT ........ 1
FACTUAL BACKGROUND ........ 2
I. EQIBank develops a business relationship with Capstone ........ 3
II. The Capstone "Portal" ........ 3
III. The Funds Seized by the Government ........ 3
IV. The Investigative Focus of the Seizure Warrants ........ 5
ARGUMENT ........ 7
I. PETITIONER SATISFIES THE RAMSDEN FACTORS; THIS COURT SHOULD EXERCISE ITS EQUITABLE JURISDICTION ........ 7
A. The government's continued retention of the Seized Funds constitutes a callous disregard for the constitutional rights of the Bank and its depositors' funds. ........ 8
B. The Bank has an individual interest in the Seized Funds. ........ 9
C. The Bank Will Be Irreparably injured by Denying Return of the Property. ........ 10
D. The Bank Has No Other Adequate Remedy at Law. ........ 10
II. SOME OR ALL OF THE SEIZED FUNDS SHOULD BE RELEASED BECAUSE THE GOVERNMENT'S LEGITIMATE INTERESTS CAN BE SATISFIED EVEN IF THE SEIZED FUNDS, IN WHOLE OR PART, ARE RETURNED AND CONTINUED RETENTION OF THE PROPERTY IS UNREASONABLE. ........ 10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ramsden v. United States*,
2 F.3d 322 (9th Cir. 1993) ........ 7, 8, 10, 13

*United States v. Comprehensive Drug Testing, Inc.*,
621 F.3d 1162 (9th Cir. 2010) ........ 9-11

*United States v. Ibrahim*,
522 F.3d 1003 (9th Cir. 2008) ........ 8, 10

*United States v. Martinson*,
809 F.2d 1364 (9th Cir. 1987) ........ 7, 8, 10

*United States v. Ritchie*,
342 F.3d 903 (9th Cir. 2003) ........ 8, 10

**Statutes**

18 U.S.C. § 981(a)(1)(A) ........ 5

18 U.S.C. § 981(k) ........ 12

18 U.S.C. § 983(d) ........ 6

18 U.S.C. § 1960 ........ 5

**Other Authorities**

Asset Forfeiture Policy Manual ch 9., § VI (U.S. Dep't of Just., Crim. Div., Money Laundering & Asset Recovery Sec. 2025) ........ 12

Federal Rule of Criminal Procedure 41(g) ........ *passim*

Justice Manual § 9-111.700, International Seizures ........ 12

U.S. Dep't of the Treasury, The Department of the Treasury's De-Risking Strategy (Apr. 2023) ........ 2

**PRELIMINARY STATEMENT**

The United States Attorney's Office for the Eastern District of California obtained seizure warrants in this District, and upon execution of those seizure warrants have taken into custody over $80 million held in an account maintained at Wells Fargo ("Wells") and about $9 million held in an account at JPMorgan Chase ("JPMorgan"), along with smaller amounts held at other institutions (collectively, the "Seized Funds"). While the Wells and JPMorgan account holder is a U.S.-based entity named Capstone Ltd. ("Capstone"), the Seized Funds were held by Capstone for the benefit of EQIBank Limited ("EQIBank" or the "Bank"). The Bank is located and regulated in the Commonwealth of Dominica ("Dominica"). Its regulator is the Financial Services Unit ("FSU") of Dominica. The Seized Funds constitute roughly 80% of the monetary assets of the Bank. As a result of the seizures, the FSU has placed the Bank under enhanced supervision and has warned the Bank of further action, including potential liquidation. The Bank faces a resulting material liquidity crisis. If the Bank fails, years of work by its directors, officers, and founders since 2018 will be destroyed. We do not believe the government has leveled any accusation against the Bank, much less its depositors, and the Seized Funds should be released. The Bank is an innocent owner of the seized funds.

Without any notice, on Thursday, April 2, 2026, the Bank learned that 80% of its monetary assets, held by Capstone, an entity that represented itself to the Bank to be a regulated U.S. money services business, were frozen. Immediately upon being notified of the seizure, the Bank's officials reached out to the Department of Justice ("DOJ") and an initial call was scheduled by the DOJ for Thursday, April 16, 2026. The Bank's officials attended the call with DOJ officials, without U.S. counsel, for approximately three hours. That initial meeting was followed by additional conferences between the government and U.S. counsel for the Bank. Through the course of these meetings, the Bank and its U.S. counsel made numerous, extensive voluntary disclosures to the government to demonstrate that the funds held in the accounts seized belonged to the Bank. The Bank also sought and secured authority from the FSU to provide information to the DOJ regarding its customers and the ultimate source of the funds held in the seized accounts. In one disclosure, the Bank identified

additional banks where Capstone maintained accounts, and to which the Bank had directed additional funds. Apparently using that information, the government obtained seizure warrants to seize an additional quantity of funds.

## FACTUAL BACKGROUND

EQIBank began taking deposits in 2019 and is a global digital bank and financial services organization for businesses, corporations, and high-net-worth individuals (https://eqibank.com/). Burke Decl. ¶ 6. It is based in and regulated by the Commonwealth of Dominica ("Dominica"). *Id.* ¶ 4. International banks depend on having access to the United States banking system to conduct U.S. dollar-denominated transactions. As the United States Treasury Department has explicitly acknowledged, access to the U.S. banking system is often subject to de-risking, "the phenomenon of financial institutions making wholesale, indiscriminate decisions about broad categories of customers."[1] As a result of de-risking, international banks, particularly those in smaller jurisdictions such as Dominica, are at constant risk of having their U.S. banking ties severed by their U.S. banking partners for risk assessments that have nothing to do with the international banking customers. Burke Decl. ¶ 8. This creates uncertainty for non-U.S. banks like EQIBank, so they must maintain multiple connections to the U.S. banking system to maintain operations. At the time of the seizure, the Bank was actively pursuing, and had obtained, additional U.S. banking relationships. *See id.* ¶ 27.

As a result, EQIBank has attempted to obtain multiple business relationships with U.S. money services businesses ("MSBs") and banks to maintain access to the U.S. financial marketplace. *Id.* Many of the Bank's clients operate in or with U.S. dollars and, as a result, it is critical that the Bank maintain such relationships. MSBs can and do act as middleman between the Bank and a United States financial institution. Obviously, EQIBank would prefer direct relationships with U.S. banks, because MSBs add a cost to the services they provide to their clients. Over time, the Bank has had different business relationships with both MSBs, and also direct relationships with U.S. financial institutions. *Id.*

---

[1] U.S. Dep't of the Treasury, The Department of the Treasury's De-Risking Strategy (Apr. 2023), https://home.treasury.gov/system/files/136/Treasury_AMLA_23_508.pdf.

## I. EQIBank develops a business relationship with Capstone

In 2024, EQIBank began a commercial relationship with Capstone. *Id.* ¶ 9. The Bank was led to believe by Capstone personnel that it was properly registered and maintained banking relationships with multiple U.S. banking institutions. *Id.* ¶ 10. The funds provided to Capstone consisted largely of funds ultimately belonging to the Bank's depositors, i.e., depository funds. *Id.* ¶ 11. Through a transaction disclosed to the FSU, Capstone holds the Bank's regulatory capital, i.e., the minimum amount of capital a bank must hold by law as mandated by the FSU. The amount is $1 million. *Id.* ¶ 12. The government has refused to return this amount – despite the Bank's agreement that it would hold the funds in a U.S. bank and not move the funds absent notice being provided the government.

## II. The Capstone "Portal"

In order for the Bank to see precisely where Capstone held the Bank's money at various U.S. financial institutions, Capstone provided a web-based portal (the "Portal"). *Id.* ¶ 13. Bank employees could log into the Portal and see the amount of funds held by Capstone at various banks for the benefit of Capstone and, ultimately, for the benefit of the Bank. *Id.* Based on interactions by the Bank's U.S. counsel with the government, the Bank now understands that, as to several accounts, the government believes Capstone may have misled U.S. banks about where Capstone maintained accounts, about Capstone's business, and about the source of funds located in the various Capstone accounts. Middlemiss Decl. ¶ 8.

## III. The Funds Seized by the Government

Beginning on April 2, 2026, the Bank has become aware, largely by notifications from Capstone, that the Bank's funds held by Capstone were seized at the direction of the government. Burke Decl. ¶ 14. Initially, the Capstone accounts at Wells and JPMorgan were held by those banks as a result of an apparent informal request by the government made sometime around February 12, 2026. Middlemiss Decl. ¶ 4. It appears that Wells ultimately determined that the informal seizure created inordinate litigation risk for Wells and required the government to obtain a seizure order to

prevent the release of the funds. Thereafter, the government obtained seizure warrants for the Capstone accounts at Wells and JPMorgan on or about June 1st, 2026. *Id.* ¶ 5. Subsequently, the government obtained warrants to seize funds maintained in Capstone accounts at Barclays Bank and ClearBank. *Id.* ¶ 6.

While EQIBank has not received copies of all warrants relating to the Seized Funds, it believes that the Seized Funds include the following:

- Wells Fargo Bank NA, Account # [redacted]7500, USD 1,861,106.49 (*see* Burke Decl. ¶ 18, Ex. A);
- Wells Fargo Securities LLC, Account # [redacted]8863, USD 79,109,828.17 (*see id.*, Ex. B);
- JPMorgan Chase, Account # [redacted]6970, USD 9,491,039.38;
- Barclays Bank, Account # [redacted]0622, EUR 411,117.14; and
- ClearBank, Account # G[redacted]0839, GBP 370,834.47.

Burke Decl. ¶ 16.

EQIBank has to date received from the government only the two seizure warrants for the Wells accounts, attached hereto as Exs. A and B. *Id.* ¶ 18. From the accounts listed above, JPMorgan Chase, Account # [redacted]6970, may have less funds in the accounts than the Portal indicated.

Because it appears that Capstone, using the Portal, may have misled the Bank as to the amount of funds held for EQIBank at certain banks, we cannot be sure of the exact total of the Seized Funds, but from discussions with the government, the number appears to exceed $90 million. *Id.* ¶ 16. These funds belong to the Bank and represent, with the exception of the $1 million in regulatory capital referenced above, its liabilities to its depositors. *Id.* ¶ 24.

These seized funds represent roughly 80% of the Bank's financial assets. *Id.* ¶ 19. The Bank faces a liquidity crisis and cannot operate much longer without access to at least some portion of these funds. *Id.*

**IV. The Investigative Focus of the Seizure Warrants**

Due to the secret nature of the criminal investigation here, most notably the fact that the affidavits in support of the seizure warrants are sealed,[2] we cannot know for sure what allegations by the government justified these seizures. Middlemiss Decl. ¶ 7. However, based upon our conversations with the government, it was apparent that the allegations, at least initially, focused largely, if not completely, on Capstone and representations that Capstone may have made to Wells and other banks. *Id.* ¶ 8. It would then appear that the government is contending that the funds that Capstone held in those accounts were the proceeds of criminal activity related to the misrepresentations made to Wells. This theory has been used in other government investigations that have resulted in Bank fraud or charges pursuant to 18 U.S.C. § 1960. *Id.* ¶ 9.

To date, the government has indicated that the Bank is not a target of the investigation as that term is defined in the U.S. Justice Manual § 9-11.151. *Id.* ¶ 10. Nor has the government indicated that any of the Bank's depositors are a target or subject of the government's investigation. *Id.* ¶ 11. The government has also not offered any evidence that any of the depositors' money is the proceeds of criminal activity by the depositors. *Id.* ¶ 12. In fact, during conversations with the government, it was apparent that at the time of the initial seizures (where the government seized the overwhelming majority of the Bank's funds in this investigation) that the government did not know the identities of any of the Bank's depositors. *Id.* ¶ 13. The Bank subsequently provided that information to the government. *Id.* ¶ 14.

On April 16, 2026, the government met telephonically for approximately three hours with several of the Bank's employees, without U.S. counsel. Burke Decl. ¶ 21. The Bank's employees attempted to provide the government with a transparent view of their business relationship with Capstone and the nature of the financial transactions that were undertaken by Capstone on their behalf. *Id.* After the meeting, the Bank voluntary provided the government with information related to its operations, its relationship with Capstone, why the Bank believed its role in transactions in Capstone's Wells accounts were transparent to Wells (as it is to other U.S. entities with which the

---

[2] The government, in discussions with the Bank's counsel, indicated that the seizure warrants were obtained pursuant to 18 U.S.C. § 981(a)(1)(A).

Bank maintains relationships), and the identities of its underlying depositors (and the Bank's liabilities to those depositors relevant to the seized Wells accounts).

After that meeting, U.S. counsel for the Bank engaged with the government over the course of the next few weeks and attempted to persuade the government to release Bank's funds so the bank could operate. The Bank offered, through its counsel, various options for releasing some or all of the funds. For example, counsel requested that the government release an initial amount of $1 million that the Bank could deposit in a U.S. bank account (one not involving Capstone) so its regulator could see that there was progress in discussions with the government. The Bank's counsel offered to provide the government with total transparency as to the $1 million fund release, so the government would know the U.S. bank where the funds were located, and written assurances by the Bank that none of the $1 million could be moved without written notification to prosecutors. If that were successful, EQIBank hoped that some smaller portion of its depositors' funds could be released so the Bank could be better able to conduct financial transactions for its clients.

On June 8, 2026, counsel for the Bank provided a letter from the Bank's regulator in the Commonwealth of Dominica indicating that the Bank was being placed on enhanced supervision because of the seizure of funds. *See* Burke Decl. ¶¶ 25, 29, Exhibit C. This is a preliminary step for the regulator to prepare to take over and liquidate the Bank if it determines that the Bank cannot operate and serve its depositors, which it ultimately cannot do if the funds are not released.[3]

On June 17, 2026, the government advised counsel to the Bank that they would not release any funds to the Bank because, in sum, they were not convinced that EQIBank was an "innocent owner" of the funds (as that term is defined under 18 U.S.C. § 983(d)), and further indicated that if any depositor wanted their funds, they would need each individual depositor to contact the U.S. Attorney's office and assert their rights to the funds. Middlemiss Decl. ¶ 15.

In a conversation prior to June 17, 2026 when the Bank's counsel challenged the government to justify holding innocent depositors funds hostage in this way, the government

[3] Because the Bank retains approximately 20% of its assets in other accounts, it is servicing clients using those funds, but the Bank is being hampered significantly in its ability to serve its customers. As a result of the limited funds accessible to it, the Bank takes longer to do things like process wire transfers for its clients (taking 7-10 days to process a wire instead of 2-3 days on average). As a result, some clients of the bank have stopped using the bank for such business activities, further imperiling its ability to operate. Burke Decl. ¶ 20.

indicated that there were certain transactions, which it did not identify in any manner, for which it had questions – only referencing to having seen one or more transfers of funds to China. *Id.* ¶ 16. But the government could not assert such transactions were actually improper or illegal because it had no information about the transactions. It is notable that U.S. financial sector engages in multi-trillion-dollar payments to China from the U.S. every year. In 2024, for example, there were over 29 billion in U.S. remittances to China, an average of over $79 million per day.[4]

## ARGUMENT

### I. PETITIONER SATISFIES THE RAMSDEN FACTORS; THIS COURT SHOULD EXERCISE ITS EQUITABLE JURISDICTION

The government sought warrants to take the Seized Funds from several Capstone bank accounts but now refuses to acknowledge the right of the innocent owner to obtain possession of those funds. Under these circumstances, where no civil forfeiture complaint has been filed and no criminal indictment has been filed, a motion pursuant to Federal Rule of Criminal Procedure 41(g) is the proper vehicle for Plaintiff to seek the return of the Seized Funds. *Ramsden v. United States*, 2 F.3d 322, 324 (9th Cir. 1993) ("[D]istrict courts have the power to entertain motions to return property seized by the government when there are no criminal proceedings pending against the movant."); *United States v. Martinson*, 809 F.2d 1364, 1369-70 (9th Cir. 1987). Federal Rule of Criminal Procedure 41(g) provides:

> MOTION TO RETURN PROPERTY. A person aggrieved by an unlawful search and seizure of property . . . may move for the property's return. The motion must be filed in the district where the property was seized. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.

Where, as here, the government has been provided with information that the owner of the property is the Bank (and its customers), the Bank is presumed to have a right to its return, regardless of

[4] *See China: Remittances*, TheGlobalEconomy.com, https://www.theglobaleconomy.com/China/remittances/ (last visited June 22, 2026).

whether or not the original seizure was lawful.[5] *Martinson*, 809 F.2d at 1369-70. Whether or not the government established a proper basis for seizing the funds held in the accounts by Capstone, the government has no factual or legal basis upon which to seek forfeiture of EQIBank's funds in those accounts and must release the funds.

Rule 41(g) filings are considered the same as a civil action in equity. *Ramsden*, 2 F.3d at 324; *see also United States v. Ibrahim*, 522 F.3d 1003, 1007-08 (9th Cir. 2008) (finding that when no criminal proceedings are pending, the district court is to treat a Rule 41(g) motion as a civil complaint and not as a motion for summary judgment); *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003).[6] In deciding whether to exercise equitable jurisdiction in these matters, the Ninth Circuit considers four factors referred to as the "*Ramsden* Factors":

1) whether the government displayed a callous disregard for the constitutional rights of the movant;

2) whether the movant has an individual interest in and need for the property he wants returned;

3) whether the movant would be irreparably injured by denying return of the property; and

4) whether the movant has an adequate remedy at law for the redress of his grievance.

*Ramsden*, 2 F.3d at 325. The Court is only required to find that the "balance of equities tilts in favor of reaching the merits" of the Rule 41(g) motion; in such instances, the district court should exercise its equitable jurisdiction to entertain the motion. *Id.* at 326 (even where one of the four factors was not met (irreparable harm), the district court did not abuse its discretion in exercising its equitable jurisdiction). Here, the balance of equities clearly tilts in favor of Plaintiff, giving this Court equitable jurisdiction over this matter.

### A. The government's continued retention of the Seized Funds constitutes a callous disregard for the constitutional rights of the Bank and its depositors' funds.

As described above, the focus of the government's investigation is clearly Capstone and

---

[5] As the government's affidavits and other documents in furtherance of the seizure warrants in this matter are sealed, we are not in a position to judge the sufficiency of those applications.

[6] As this Court is required to treat this motion as a civil complaint, Plaintiff has not set forth every fact in support of its requested relief, have not submitted evidence, and reserve the right to do so as this case proceeds.

whether Capstone made criminal misrepresentations to Wells about the financial transactions that would take place in those accounts that were opened. Assuming for the moment that such allegations are true, it only means that the government's initial seizure was proper. But the government's continuing refusal to release funds to its owner – the Bank and its clearly innocent depositor – which places the Bank at imminent risk of being taken over and liquidated by its regulator, can only be described as callous.

A pre-judgment seizure of funds should not be allowed to be implemented as a death penalty for a legitimate business entity. To do so would be to act utterly indifferent to the harm that this would inflict on those for whom the government does not have sufficient evidence of criminal behavior.

This factor weighs in favor of the Bank and its depositors.

**B. The Bank has an individual interest in the Seized Funds.**

The Bank's interest in the Seized Funds should be obvious. It entrusted the Seized Funds to Capstone so the Bank could conduct financial transactions on behalf of its depositors, and seizure of the funds greatly damages the Bank's ability to operate properly. In the seminal case, *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1173-74 (9th Cir. 2010), the Court permitted professional baseball's Players Association to bring a Rule 41(g) motion despite not having a specific or particular property interest in the seized evidence, explaining that Rule 41(g) "nowhere speaks of an ownership interest; rather, by its plain terms, it authorizes anyone aggrieved by a deprivation of property to seek its return." The Court permitted the Players Association to bring the Rule 41(g) motion because the seized property constituted a breach of confidentiality agreements, violated its player-member privacy interests, and "interfere[d] with the operation of its business." *Id.*

The case is even stronger for the Bank in this matter, as the Bank is a regulated entity with statutory and regulatory obligations regarding the Seized Funds, in addition to its contractual obligations to its depositors. And, as has been repeatedly stated above, the government's continued retention of the Seized Funds is greatly interfering with the operation of the Bank's business

activities.

This factor heavily weighs in favor of the Bank.

### C. The Bank Will Be Irreparably injured by Denying Return of the Property.

The Bank requires the return of its funds immediately or faces imposition of a receiver and liquidation in the near term. This will also cost the regulator significant funds to pay the costs of a receiver and to oversee an otherwise needless liquidation where neither the Bank nor its depositors have been adjudicated to have violated any laws or regulations.

### D. The Bank Has No Other Adequate Remedy at Law.

Until the government files a civil forfeiture complaint or an indictment there is no remedy at law the Bank can pursue other than a Rule 41(g) motion. *See Martinson*, 809 F.2d at 1368 (rejecting argument by government that movant needed to file an independent civil action instead of the equitable return of property motion and finding there was no other adequate remedy at law); *Ibrahim*, 522 F.3d at 1007 ("Because there were no criminal proceedings pending at the time of filing, the district court properly treated the motion as a civil complaint governed by the Federal Rules of Civil Procedure.") (citing *Ritchie*, 342 F.3d at 906–07).

This factor weighs in favor of the Bank.

In sum, each of the four factors weighs in favor of this Court exercising its equitable jurisdiction over this matter so it can determine whether "allow the government to retain the property, order it returned or (as happened in *Ramsden* ) craft a compromise solution that seeks to accommodate the interests of all parties." *Comprehensive Drug Testing*, 621 F.3d at 1173.

## II. SOME OR ALL OF THE SEIZED FUNDS SHOULD BE RELEASED BECAUSE THE GOVERNMENT'S LEGITIMATE INTERESTS CAN BE SATISFIED EVEN IF THE SEIZED FUNDS, IN WHOLE OR PART, ARE RETURNED AND CONTINUED RETENTION OF THE PROPERTY IS UNREASONABLE.

Once the Court finds that it has equitable jurisdiction over the motion, the Court must determine whether the property should be returned to the movant. On the merits, the test is reasonableness under all circumstances, considering whether the United States' legitimate interests can be satisfied even if the property is returned. *Ramsden*, 2 F.3d at 326-27. "[I]f the United States' legitimate interests can be satisfied <u>even if the property is returned</u>, continued retention of the

property would become unreasonable." *Id*. (emphasis added) (quoting Advisory Committee Notes to the 1989 Amendment of Rule 41(e), predecessor to Rule 41(g)).

Federal Rule of Criminal Procedure 41 is broader than the Fourth Amendment exclusionary rule: a movant need not establish that the search was unlawful. It is sufficient that the movant has been deprived of property and that the government no longer has a legitimate reason to retain it. *Comprehensive Drug Testing*, 621 F.3d at 1173. ("That Rule 41(g) is broader than the exclusionary rule can no longer be in doubt ….").

Here, the government has no basis to state that its interests cannot be served if some or all of the Seized Funds are returned. As has been communicated to the government, the Seized Funds largely comprise of depositors' funds, which the Bank must return upon any depositor's request, and the Bank's retention of depositor funds is supervised by its regulator. The government has, to date, expressed no indication that they suspect that the Bank would misappropriate the funds of depositors. And with no evidence that its depositors have committed any crimes, such funds should be released immediately.

To that end, the Bank has already offered – and continues to offer – to discuss with the DOJ terms under which the Seized Funds would be released, to attempt to give the DOJ comfort that some unexpressed concern it may have about the Bank's use of the funds will not occur. For example, discussed earlier was the $1 million regulatory fund to which the Bank has offered complete transparency and offered to make written assurances that such funds, although available to the Bank, would not be moved without notice to DOJ (thus subjecting such officials to the risk of sanction or possible criminal penalties if they violated such conditions).

Further, the Bank would be willing to engage with DOJ over conditions by which some or all of the depositors' funds would be released (immediately or over an agreed-upon schedule) to give the DOJ assurance that it will operate in compliance with U.S. law. For example, the Bank has obtained permission from its regulator to cooperate with DOJ and may permit exchanges of information that ordinarily might be complicated by its local banking regulatory and banking secrecy rules.[7] *See* Ex. C.

[7] While the Bank cannot prevent a depositor from withdrawing funds from a bank account, which might be viewed as

To stress the seriousness of the policy implications of what the government is attempting to do here, consider the nearly identical action the government might take under 18 U.S.C. § 981(k) – where the government seeks to seize funds possessed in an account outside the jurisdiction of the United States, but does so by seizing an equivalent amount from a U.S. bank account held by the non-U.S. bank. In such cases, the Justice Manual directs the prosecution team to make an assortment of notifications and obtain approvals from the Department of Justice Money Laundering and Asset Recovery Section ("MLARS") and Office of International Affairs ("OIA") because seizing funds like this "raises important policy considerations" and instructs prosecutors to "take special care to ensure that the restrained … account is limited to the amount of tainted funds traceable to, and on deposit in, the foreign bank account." Asset Forfeiture Policy Manual ch 9., § VI (U.S. Dep't of Just., Crim. Div., Money Laundering & Asset Recovery Sec. 2025), https://www.justice.gov/criminal/criminal-afmls/file/839521/dl (Approval Process for 18 U.S.C. § 981(k)); *see also* Justice Manual § 9-111.700, *International Seizures*, https://www.justice.gov/jm/jm-9-111000-forfeitureseizure (Section 981(k) seizures require consultation with OIA, Department of Treasury, and Department of State because of the "policy issues implicated" by the use of the statute). Due to the catastrophic harm that the government's seizure will have on this non-U.S. Bank, the prosecution team here seems to be turning a blind eye to the damage it will cause if the relief requested is not granted.

Finally, in response to the only argument the government has raised – that EQIBank is not an "innocent owner," there are several responses. First, there is no evidence that EQIBank participated in whatever deception Capstone may have perpetrated against Wells. Second, EQIBank was never concerned about direct and transparent relationships with the U.S. banking system, such that deception would be necessary. In fact, it prefers a direct U.S. banking relationship. Third, EQIBank's past and current banking relationships demonstrate its transparency to the U.S. banking system, including, 1) with Zenus Bank (a direct banking relationship with Zenus who is based in Puerto Rico), 2) with Clarency (an international financial services company that provided

---

a dissipation of the funds – unless the government can demonstrate to the bank that it has cause to believe such funds are contraband this should not be a harm to the government's interest, as it should have no interest in holding an innocent depositor's funds.

correspondent banking through DBS Singapore), 3) with Thunes (a financial technology company that provided correspondent banking through Barclays Bank PLC), 4) with Xprowire Holdings LTD (a financial services company that provided correspondent banking through Slovak Savings Bank, located in Pittsburgh, PA) and 5) with Ionfi (a financial technology company that provided correspondent banking through Portage Bank, located in Bellevue, Washington).

* * * * *

In sum, EQIBank is not a rogue bank that was openly transacting in drug cartel money or funds held by U.S.-sanctioned individuals. The Bank was not hiding its existence from the U.S. banking system, as it currently has other direct banking relationships with U.S.-based banks. It appears that its greatest crime was being victimized by an MSB intermediary that may have misled one of its U.S. banking partners and that also may have misappropriated the Bank's funds. No allegations against the bank's depositors have been made public. As a result, the government should focus its investigative efforts on the criminal activity and not leverage this seizure of the Bank's funds as a tool for accomplishing an end result (liquidation of the Bank) that it cannot currently sustain through civil or criminal proceedings – such as by forfeiture complaint or indictment. As a result, under this Circuit's well-settled law, the government's "legitimate interests can be satisfied even if the property is returned." *Ramsden*, 2 F.3d at 326-27.

For all the foregoing reasons, the Seized Funds should be returned to the Bank in their entirety.

In the alternative, $1 million should be immediately released so the Bank may deposit those funds with a U.S.-based bank in an account held by the Bank. And the DOJ should be ordered to meet and confer on conditions acceptable to both parties by which some or all of the remaining funds can be released, with an obligation to report to the Court the outcome in one week so that the funds will be either released on terms agreeable to both parties, or, if no consensus is achieved, the Bank may seek further relief from the Court.

DATED: June 24, 2026

/s/ Jessica Ruth Lobis Buckwalter
Jessica Ruth Lobis Buckwalter, Esq.
LEWIS BAACH KAUMFANN
MIDDLEMISS PLLC
1050 K Street, NW, Suite 400
Washington, DC 20001
(202) 659-7971
jessica.buckwalter@LBKMlaw.com

*Attorneys for Plaintiff EQIBank Limited*